# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

VERNELL HEMPHILL

**CRIMINAL COMPLAINT**

CASE NUMBER: 08CR 0047

MAGISTRATE JUDGE MASON

FILED
KC 1-17-08
JAN 17 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, HOLLY BARRILE, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about November 17, 2006 in Cook county, in the Northern District of Illinois defendant(s) did,

conspire with another to knowingly and intentionally distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing heroin, in violation of Title 21 U.S.C. § 841(a)(1),

in violation of Title 21 United States Code, Section(s) 846.

I further state that I am a(n) Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:
Official Title

See attached affidavit.

Continued on the attached sheet and made a part hereof:  X  Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 17, 2008                                at        Chicago, Illinois
Date                                                         City and State

MICHAEL T. MASON, U.S. MAGISTRATE JUDGE       _____
Name & Title of Judicial Officer                              Signature of Judicial Officer

State of Illinois        )
                         ) SS
County of Cook           )

## AFFIDAVIT

I, Holly Barrile, being first duly sworn on oath, depose and state as follows:

### Background of Affiant

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 1996. In connection with my FBI duties, I investigate criminal violations of the federal narcotic laws, including but not limited to 21 U.S.C. §§ 841, 843, and 846. I also have received specialized training in the enforcement of laws concerning the activities of narcotic traffickers.

2.  The information set forth in this affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, my review of audio and video recordings made during this investigation, information conveyed to me by other local, state, and federal law enforcement officers, and information provided by cooperating witnesses. Because this affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against VERNELL HEMPHILL, also known as (aka) "KENO" ("HEMPHILL") and PRINCE BEY, aka "NIKO" ("BEY"), it does not contain everything that I or other law enforcement officers know about HEMPHILL or BEY.

### Information Provided by a Cooperating Witness

3.  Some of the information contained in this Affidavit has been provided by a cooperating witness ("CW"). CW has assisted the FBI in ongoing criminal investigations and has

1

cooperated for money and has been reimbursed for expenses. Information provided by CW has resulted in 10 arrests and the seizure of narcotics valued at over $270,000, including cocaine, heroin, and marijuana, and therefore the CW has proven reliable. The CW has a previous felony conviction for robbery. CW is an admitted high ranking member of the Black P-Stone Nation street gang ("BPSN"). CW has identified HEMPHILL as a high ranking BPSN member responsible for drug distribution and gang activity in an area on the South Side of Chicago controlled by the BPSN. The CW was introduced to BEY in around August 2006. The CW and BEY had extensive telephonic and in-person contact with each other during from then until the narcotics transaction described below. The CW previously had been introduced to HEMPHILL; however, the CW did not believe he/she could purchase narcotics directly from him. BEY advised the CW that he had been buying narcotics from HEMPHILL and offered to introduce the CW to HEMPHILL to purchase 100 grams of heroin.

4. The information provided by the CW in this Affidavit has been corroborated by agents whenever possible by, among other things, the use of electronic recording devices and physical surveillance. I have included my understanding of some of the words and phrases used in the recorded conversations set forth in the Affidavit. My understanding is based on the content and context of the conversations, information provided by the CW who participated in the recorded conversation, my training and experience, and the experience of other law enforcement officers.

### November 17, 2006 Drug Transaction

5. On November 17, 2006, the CW placed and received unrecorded several phone calls to BEY to discuss the narcotics transaction which was to take place with HEMPHILL.

6. At approximately 2:00 a.m. on November 17, 2006, the CW received an unrecorded

telephone number 773-855-8815. During this call, the CW told BEY that if he didn't have it (the heroin), then they could complete the transaction another day. BEY advised that he would call HEMPHILL.

11. At approximately 2:28 p.m., the CW received a consensually-recorded call from BEY at (773) 855-8815. BEY informed the CW that HEMPHILL had spoken with the Nigerian, who was expected to arrive at the store in approximately twenty minutes.

12. At approximately 2:58 p.m., CW received a consensually-recorded call from BEY at telephone number (773) 855-8815. BEY told the CW that the Nigerian male was due to arrive at the store in ten minutes. BEY stated that HEMPHILL would call BEY as soon as the Nigerian male arrived at the store.

13. At approximately 3:43 p.m., CW received a consensually-recorded call from BEY using telephone number (773) 559-9025. During this call, BEY told the CW that HEMPHILL was ready and that BEY would be standing out in front of 1048 W. Garfield.

14. At approximately 3:45 p.m., agents searched the CW and his/her vehicle for weapons, drugs, contraband and excessive money, none of which was found. Agents then provided the CW with $8,500.00 in official funds to purchase one hundred grams of heroin.

15. At approximately 3:59 p.m., CW received a call from BEY on telephone number (773) 559-9025, which was consensully-recorded. BEY asked where CW was, and stated again that he was standing out front.

16. At approximately 4:05 p.m., the CW was equipped with a concealed audio recorder and a transmitter. Followed by agents, the CW then drove to the area of 6524 S. Mozart Avenue in Chicago where he/she picked up an individual to be security.

17.     At approximately 4:11 p.m., the CW received a call from BEY at telephone number (773) 559-9025, which was consensually-recorded. During this call, BEY told the CW that he did not wish to spook HEMPHILL (by keeping HEMPHILL waiting too long). The CW explained that he/she was stuck in traffic and would arrive shortly.

18.     The CW, followed by agents, proceeded to 1048 W. Garfield Boulevard to pick up BEY. BEY entered the CW's vehicle and they proceeded to Mob Gear to meet with HEMPHILL.

19.     After parking in the lot adjacent to the store, BEY and the CW entered Mob Gear. Present were HEMPHILL, his Nigerian supplier, and another person whom the CW could not recall by name but knew to be a BPSN member.

20.     After the initial introductions were made, HEMPHILL and the CW went to the rear of the store where HEMPHILL explained that the Nigerian was cautious of new customers because he had recently been robbed of five hundred grams of heroin. Then HEMPHILL asked if BEY had told the CW the "number" (meaning the price for 100 grams of heroin). The CW asked "$8,000.00?" HEMPHILL replied "yes." The CW asked if HEMPHILL had one hundred grams. HEMPHILL said yes.

21.     HEMPHILL then directed the CW to a bathroom where they counted the $8,000. While they counted, HEMPHILL commented that the Nigerian male has high quality, pure, heroin.

22.     After the money was counted, HEMPHILL opened the bathroom door and went out with the Nigerian male to the Nigerian male's car, where they counted the money again. HEMPHILL and the Nigerian male came right back into the store. After returning to the store, HEMPHILL and the CW went back to the bathroom where HEMPHILL handed the CW a plastic wrapped substance suspected to be heroin. HEMPHILL told the CW to look the stuff over and see

if it was cool. HEMPHILL told the CW that he would take care of him/her the next time, meaning that the CW could deal directly with HEMPHILL.

23. Following the transaction, the CW left the store accompanied by BEY. They entered the CW's car and the CW, followed by agents, drove to BEY's residence at 1048 W. 55th, where he/she gave BEY $500.00 for arranging the transaction between HEMPHILL, the Nigerian and the CW.

24. Followed by agents, the CW then proceeded to a prearranged meeting location and turned over the suspected heroin to agents. The CW and his/her vehicle were searched for weapons, drugs, contraband or excessive funds; nothing was found, other than the suspected heroin.

25. The suspected heroin was subsequently tested by the DEA laboratory, which concluded that the substance was 99.6 grams of heroin.

26. I believe that the substance purchased from HEMPHILL was heroin based on, among other things: (1) my experience as a law enforcement officer; and (2) a visual inspection of the substance itself.

27.     Based on the foregoing, I respectfully submit that there exists probable cause to believe that VERNELL HEMPHILL and PRINCE BEY conspired to knowingly and intentionally distribute a controlled substance, namely 100 grams or more of a mixture and substance containing 100 grams of heroin, in violation of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Section 846.

HOLLY BARRILE
SPECIAL AGENT, FEDERAL BUREAU
OF INVESTIGATION

Sworn to and subscribed to before me on
this 17th day of January 2008.

MICHAEL T. MASON
UNITED STATES MAGISTRATE JUDGE